**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

| | |
|---|---|
| **VICKI ANN RAYBURN,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**WADY INDUSTRIES, INC., and LORI J. FEY,**<br><br>**Defendants.** | **No. C07-1008**<br><br>**RULING ON MOTION FOR SUMMARY JUDGMENT** |

---

**TABLE OF CONTENTS**

*I.* *INTRODUCTION* . . . . . . . . . . 2

*II.* *PROCEDURAL BACKGROUND* . . . . . . . . . . 2

*III.* *RELEVANT FACTS* . . . . . . . . . . 2

*IV.* *LEGAL STANDARD FOR SUMMARY JUDGMENT* . . . . . . . . . . 9

*V.* *DISCUSSION* . . . . . . . . . . 10
- ***A.*** ***Is there a Clearly Defined Public Policy?*** . . . . . . . . . . 11
- ***B.*** ***Would Discharge of Employment Undermine Public Policy?*** . . . . . . . . . . 14
- ***C.*** ***Did Rayburn's Discharge Result from Her Protected Activity?*** . . . . . . . . . . 15
- ***D.*** ***Is Other Justification for Rayburn's Termination Lacking?*** . . . . . . . . . . 19

*VI.* *CONCLUSION* . . . . . . . . . . 20

*ORDER* . . . . . . . . . . 20

## *I. INTRODUCTION*

This matter comes before the Court on the Motion for Partial Summary Judgment (docket number 16) filed by Defendants Wady Industries, Inc., and Lori J. Fey on February 25, 2008, and the Resistance (docket number 18) filed by Plaintiff Vicki Ann Rayburn on March 14, 2008. Plaintiff's request for "in-person oral argument" is denied. The motion will be decided without oral argument. *See* Local Rule 7.c.

## *II. PROCEDURAL BACKGROUND*

On August 4, 2006, Plaintiff Vicki Ann Rayburn ("Rayburn") timely filed charges of employment discrimination against Defendants with the Iowa Civil Rights Commission ("ICRC") and the Equal Employment Opportunity Commission ("EEOC"). On February 13, 2007, the ICRC issued an Administrative Release (right-to-sue letter) to Rayburn with respect to her charges of discrimination. On March 6, 2007, the EEOC also issued a Notice of Right to Sue to Rayburn.

On April 5, 2007, Rayburn filed a Complaint and Jury Demand (docket number 2) alleging sexual harassment and retaliation by Defendants, in violation of the Iowa Civil Rights Act, Iowa Code Chapter 216 (Count I), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Count II). Rayburn also alleged wrongful discharge in violation of public policy (Count III). Defendants filed an Answer (docket number 5) on April 30, 2007, and an Amended Answer (docket number 7) on May 3, 2007. On June 26, 2007, both parties consented to proceed before a United States Magistrate Judge, pursuant to the provisions set forth in 28 U.S.C. § 636(c). Trial is scheduled before the undersigned on August 4, 2008.

## *III. RELEVANT FACTS*

Rayburn began working at Defendant Wady Industries, Inc. ("Wady") as a production worker in 2005. Rayburn worked during the same shift, and in the same area, as John Miller ("Miller"). Rayburn's work station and Miller's work station were approximately sixty feet apart. Rayburn and Miller became friends. In July 2005, Miller began living with Rayburn in her apartment. In October 2005, however, Rayburn asked

Miller to leave because he drank too much alcohol and his demeanor changed when he was drinking.[1]

Also in October 2005, both Rayburn and Miller were laid off from work at Wady. In March 2006, Rayburn and Miller were called back to work at Wady. Miller asked Rayburn if he could live at her apartment again. Rayburn agreed to allow Miller to live with her on the condition that he did not drink alcohol and worked at getting his driver's license back. Miller lived at Rayburn's apartment through April 2006.

On April 28, 2006, Miller was drinking wine to celebrate his completion of drunk driving school. In her deposition, Rayburn described the events which followed after Miller drank two bottles of wine:

> Q: So [Miller] drank, on April 28 of 2006, he drank a couple of bottles of wine?
> A: Yes.
> Q: And you were drinking a beer?
> A: Yes.
> Q: Tell me as specifically as you can what happened[.] . . .
> A: I said -- I said something to him about 'Boy, it didn't take long to get them bottles gone, did it?' And this is when he said, 'Well, you are nothing but a drunk' after he drank two bottles of wine and I drank one glass of beer and he is telling me I am nothing but a drunk. He took the rest of the beer that was in the refrigerator out and started opening them up and started pouring them in the sink, and he poured the glass of beer what was left over me.
> Q: Did he appear to be angry?
> A: I couldn't exactly tell you how he appeared to be but he was not the [person] I knew that wasn't drinking. He was scary.

[1] Miller also stayed at Rayburn's apartment for a few days in November 2005. At that time, Miller lived in Andrew, Iowa, and was unable to drive a car. Miller's mother was in the hospital in Maquoketa, Iowa. Because Rayburn lived in Maquoketa, and Miller was unable to drive from Andrew to Maquoketa, Miller asked if he could stay with Rayburn while his mother was in the hospital.

Q: Do you have any idea why he was pouring all the beer out?

A: Because I made a remark about how he was acting after two bottles of wine. . . .

Q: So then what happened after he poured all the beer out?

A: I just sat there at the table, I was kind of a little scared and I told him, I said, '. . . I want you to get your stuff together, I want you out,' and he headed -- well, he took off into the other room, I don't know where he was at. Well, I went in to take a shower and when I come back out he was gone, so I went -- walked down and talked to a friend of mine for a little while.

When I come back he was back, and from there I told him, I said, '. . . I told you I want you out.' I said, 'Get your stuff, get you a ride home, I want you out,' and he says, 'Well, I don't have to leave.' I said, 'Oh, yes, you do,' and I picked up my cell phone and headed out the front door or headed to the front door.

He shoved me into my stove and I had pretty good sized bruise on me, and when I got right towards the front door he had gotten up to me and he grabbed ahold of my hand where I had the cell phone in my hand and he twisted and bent, hurt one finger, . . . so that is when I managed to get out the door down to the pay phone and I called the law.

(Defendants' Appendix at 19-20; Rayburn's Deposition, p. 27, l. 2 - p. 29, l. 4)

Police officers arrived at Rayburn's apartment and took Miller to jail, where he spent the night. On April 30, 2006, the Iowa District Court for Jackson County issued a No-Contact Order against Miller in conjunction with a criminal prosecution of domestic abuse assault, in violation of Iowa Code § 708.2A (2005). The order restrained Miller from "committing further acts of abuse or threats of abuse" against Rayburn and restrained him from "any contact" with Rayburn.[2] The order also provided, however, that "[Miller]

[2] *See* Defendants' Appendix at 42-43.

is allowed to continue working at Wadys and contact allowed as necessitated by employment."[3]

According to Rayburn, about two weeks after the no-contact order was entered, she complained to Tom Daurelle ("Daurelle"), Wady personnel manager, that Miller was leering at her while she was working. In response, Wady erected a tarp to separate Rayburn's and Miller's work stations.

According to Defendants, on May 11, 2006, the Maquoketa police came to Wady and asked to speak with Miller in response to a complaint filed by Rayburn. Rayburn disputes Defendants' assertion and claims that the Maquoketa police spoke only to her on May 11, 2006. After speaking with Rayburn, the police determined that a violation of the no-contact order had not taken place.[4]

Defendants claim that the Maquoketa police came to Wady again on June 13, 2006, in response to another complaint filed by Rayburn. Rayburn disputes this claim as well. Rayburn acknowledges that she filed a complaint with the Maquoketa police, asserting that Miller violated the no-contact order on several occasions. Rayburn disputes, however, that the police came to Wady on June 13, 2006. In his deposition, Brad Koranda, Maquoketa Chief of Police ("Chief Koranda"), indicates that Rayburn's June 13, 2006 complaint was addressed at the Maquoketa police station, and not at Wady. Specifically, Chief Koranda testified:

> Q: Okay. Can you tell me, Chief Koranda, what you recall about the circumstances that gave rise to the creation of this incident report[, dated June 13, 2006] . . . ?
>
> A: Well, basically when this -- [Rayburn] had come in and spoke with me and went over some issues that had happened in the past. I believe it was some kind of a

---

[3] *Id.* at 43.

[4] *See* Maquoketa Police Department Call for Service Record, dated May 11, 2006; Defendants' Appendix at 45-46 ("After talking to [Rayburn] this was not a violation of the no contact order." *Id.* at 46).

driving issue, started at -- kind of at WADY on break maybe and [Miller] followed her around in the vehicles, and that had happened on June 2, which would have been about eleven days prior to the time she came in to talk with me.

Then she had another time I believe on here, June 4, was at Wal-Mart, basically [Miller] was just driving through the parking lot at that time. On Monday June 12 at work [Miller] was calling her names like whore, bitch, which has nothing to do with checking his parts I guess is what maybe [Miller] used the excuse of checking something over in her area. This is what [Rayburn] wrote me that day.

. . .

Q: Let me ask you about what you recall about your contact with [Rayburn] on that day. Again correct me if I am wrong, is it your recollection that your contact with [Rayburn] would have been on June 13, 2006?
A: Yeah, I believe so.
Q: Okay. And where did that occur?
A: In the lobby out here in the office.
Q: Okay. Tell me what you recall about that interaction that you had with . . . Rayburn that day.
A: Basically she came in and was somewhat upset over all these incidences happening. She wanted to know what she could do. I kind of explained the whole situation, I believe I kind of explained what we could do, and I needed a statement from her on the incidents that she is telling me about so I had her write a statement.

. . .

Q: Okay. And then if you could, Chief, tell me what, if anything, your agency did in response to her filing this statement with your office?
A: Like I said, I believe that this may have spurred my trying to get ahold of . . . Miller, and I know I did take -- it took a few days for me to get ahold of him . . . I know that is probably what I originally started trying to

do was contact him from this to explain that and get his side of the story I guess is what I first tried to do.

(Defendants' Appendix at 38; Chief Koranda's Deposition, p. 29, l. 8 - p. 32, l. 11)

On June 24, 2006, Rayburn filed a third complaint with the Maquoketa police claiming that Miller violated the no-contact order by calling her and then refusing to say anything.[5] On June 26, 2006, Rayburn reported another violation of the no-contact order to the Maquoketa police. Specifically, Rayburn informed the police that Miller pulled down the tarp separating their work stations, looked at her, and grunted at her. Chief Koranda went to Wady and spoke with Miller. Chief Koranda noticed an odor of alcohol coming from Miller and asked him what happened with Rayburn. Miller told Chief Koranda in a very agitated tone that he did nothing. Chief Koranda asked Miller if he had been drinking. Miller denied that he had been drinking and refused to take a breath test. Chief Koranda then arrested Miller on the no-contact order violation.

On at least two occasions after the police came to Rayburn's workplace, Defendants assert that they "warned [Rayburn] . . . that anything that happened away from work cannot be brought into work, it is disruptive, we don't want the police coming from something that had nothing to do with WADY."[6] On July 10, 2006, Rayburn was

---

[5] Rayburn knew that Miller was calling her because she recognized his phone number on Caller I.D.

[6] *See* Defendants' Appendix at 22; Lori Fey's Deposition, p. 18, ll. 2-6. In her deposition, Lori Fey also stated:

> Q: Okay. Then were there others after that?
>
> A: After the police came again to WADY we told [Rayburn] again this incident had taken place over the weekend, it was disruptive, we didn't want the police to come there, we had no control of what happened away from work, and we had also had complaints that [Rayburn] was talking to employees about this whole incident with [Miller] during work hours and that we had -- that could not happen during work hours.

*See* Defendants' Appendix at 22; Lori Fey's Deposition, p. 18, ll. 10-19.

terminated from employment for disrupting the workplace. In her deposition, Lori Fey ("Fey") provided the following reasons for Rayburn's termination:

> Q: Could you tell me how [the] decision [to terminate Rayburn] was made?
>
> A: It was made after three visits from the police, the reports from other employees that [Rayburn] was discussing the circumstances between her and [Miller], basically had our plant in turmoil, and we had -- she spoke to a couple of our employees later towards the end and made the mention of going after [Miller] for what she could get and then going after WADY, and that was two employees came to us about that and we just decided that the disruption in the plant we had to make some sort of decision and we decided to terminate her.

(Defendants' Appendix at 25; Lori Fey's Deposition, p. 29, ll. 2-14) Additionally, Daurelle provided the following deposition testimony regarding the reasons for Rayburn's termination:

> Q: So if I asked you who made the decision to terminate . . . Rayburn, should I conclude that you and . . . Fey acting together made that decision, is that an accurate summary?
>
> A: That would be accurate.
>
> Q: Okay. And when did you make that decision?
>
> A: Sometime during the week of 4th of July.
>
> . . .
>
> Q: Sure. What circumstances were paramount or primary in your deciding to terminate . . . Rayburn?
>
> A: Probably first and foremost would be the police presence during working hours and that police presence was for nonwork-related issues. And secondly would be the disruption of the workplace and [Rayburn] talking to fellow employees about what was going on outside of work between her and [Miller].

(Plaintiff's Appendix at 12; Thomas Daurelle's Deposition, p. 13, ll. 3-24) Other facts that are significant for making a determination on Defendants' Motion for Partial Summary

Judgment will be discussed, as necessary, in the Court's consideration of the legal issues presented.

### *IV. LEGAL STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is appropriate if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party.'" *Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 821 (8th Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Procedurally, the moving party bears the initial responsibility of informing the court of the basis for its motion, and must identify those portions of the record which it contends show a lack of a genuine issue of material fact. *Heisler v. Metropolitan Council*, 339 F.3d 622, 631 (8th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (same). Once the moving party has successfully carried its burden under Rule 56(c), the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see, e.g., Baum v. Helget Gas Products, Inc.*, 440 F.3d 1019, 1022 (8th Cir. 2006) ("Summary judgment is not appropriate if the non-moving party can set forth specific facts, by affidavit, deposition, or other evidence, showing a genuine issue for trial."). The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "'Evidence, not contentions, avoids

summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)).

## *V. DISCUSSION*

Defendants argue that they are entitled to summary judgment on Rayburn's claim of wrongful discharge in violation of public policy, as set forth in Count III of her Complaint and Jury Demand. Defendants maintain that Rayburn's discharge did not violate any public policy as a matter of law. Specifically, Defendants argue Rayburn is unable to articulate a clearly defined public policy which protects an at-will employee from discharge for reporting violations of a no-contact order in the workplace. Rayburn argues that Defendants are not entitled to summary judgment, because there is a clear public policy in Iowa which favors the reporting of crimes and wrongdoing. Rayburn maintains that she cannot be terminated from employment for engaging in an activity which is protected by the public policy.

Under Iowa law, "[a]bsent a valid contract of employment, an employment relationship is generally considered to be inherently indefinite and presumed to be at-will." *Fitzgerald v. Salsbury Chemical, Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (citing *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 281 (Iowa 1995)). An at-will employment relationship may be terminated by either party "'at any time, for any reason, or no reason at all.'" *Fitzgerald*, 613 N.W.2d at 280 (quoting *Phipps v. IASD Health Servs. Corp.*, 558 N.W.2d 198, 202 (Iowa 1997)); *see also Theisen v. Covenant Medical Center, Inc.*, 636 N.W.2d 74, 79 (Iowa 2001) ("The doctrine of employment-at-will, well-established in Iowa law, permits an employer or employee who is not under contract to terminate employment at any time for any lawful reason."). It is undisputed that Rayburn was an at-will employee.

The Iowa Supreme Court recognizes two exceptions to the employment-at-will doctrine: (1) discharge in violation of public policy and (2) discharge in violation of an employee handbook which constitutes a unilateral contract. *Fitzgerald*, 613 N.W.2d at 281; *see also Theisen*, 636 N.W.2d at 79 (recognizing the public policy exception and

employee handbook exception to the doctrine of at-will employment). In this case, the Court is presented with the issue of whether Rayburn's employment was terminated in violation of a public policy.

In order to succeed on her claim of wrongful discharge in violation of public policy, Rayburn must prove: (1) The existence of a clearly defined public policy that protects an activity; (2) the clearly defined public policy would be undermined by a discharge of employment; (3) the challenged discharge resulted from participating in the protected activity; and (4) other justification for the discharge was lacking. *Lloyd v. Drake University*, 686 N.W.2d 225, 228 (Iowa 2004) (citations omitted); *see also Davis v. Horton*, 661 N.W.2d 533, 535-36 (Iowa 2003) (setting forth the same four element test).

### *A. Is there a Clearly Defined Public Policy?*

In determining whether a public policy exists, the Iowa Supreme Court has "generally looked only to [Iowa] statutes and [the Iowa] state constitution." *Lloyd*, 686 N.W.2d at 229 (citing *Fitzgerald*, 613 N.W.2d at 283). "Regardless of the source, however, '[courts should] proceed cautiously and . . . only extend such recognition to those policies that are well recognized and clearly defined.'" *Lloyd*, 686 N.W.2d at 229 (quoting *Davis*, 661 N.W.2d at 536); *see also Fitzgerald*, 613 N.W.2d at 282 (courts should be "careful to limit the tort action for wrongful discharge to cases involving only a well-recognized and clear public policy"); *Springer v. Weeks and Leo Co., Inc.*, 429 N.W.2d 558, 560 (Iowa 1988) (the tort of wrongful discharge should be limited to cases where "the discharge serves to frustrate a well-recognized and defined public policy of the state").

The "insistence on using only clear and well-recognized public policy to serve as the basis for the wrongful discharge tort emphasizes [the] general adherence to the at-will employment doctrine and the need to carefully balance the competing interests of employee, employer, and society." *Fitzgerald*, 613 N.W.2d at 283 (citations omitted). The need for a clear and well-recognized public policy is reinforced by the unwillingness of the Iowa Supreme Court to "search too far beyond our legislative pronouncements and

constitution to find public policy to support an action." *Id.* Specifically, when discussing statutorily defined public policy, the Iowa Supreme Court has stated generally:

> Some statutes articulate public policy by specifically prohibiting employers from discharging employees for engaging in certain conduct or other circumstances. Yet, we do not limit the public policy exception to specific statutes which mandate protection for employees. Instead, we look to other statutes which not only define clear public policy but imply a prohibition against termination from employment to avoid undermining that policy.

*Id.* (internal citations omitted).

The Iowa Supreme Court has recognized a number of clearly defined public policies in the context of a wrongful discharge claim. *See Fitzgerald*, 613 N.W.2d at 285-89 (public policy in favor of providing truthful testimony); *Teachout v. Forest City Community School Dist.*, 584 N.W.2d 296, 300-01 (Iowa 1998) (public policy in favor of reporting suspected child abuse); *Tullis v. Merrill*, 584 N.W.2d 236, 239 (Iowa 1998) (public policy in favor of permitting employees to make demand for wages); *Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994) (public policy in favor of permitting employees to seek unemployment benefits); *Springer*, 429 N.W.2d at 560-61 (public policy in favor of permitting employees to seek workers' compensation for work-related injuries). Iowa courts have not addressed the question of whether there is a public policy in favor of reporting crimes or wrongdoings generally, or in reporting violations of no-contact orders specifically.

In her brief, Rayburn frames the issue as whether reporting crimes or wrongdoings is protected by a clearly defined public policy. She implicitly includes reporting a violation of a no-contact order within the broader activity of reporting crimes or wrongdoings. The Court believes that the issue should be narrowly framed to the facts of this case: whether reporting to police a violation of a no-contact order, which was entered as a result of domestic abuse assault, is an activity which is protected by a clearly defined Iowa public policy.

Chapter 664A of the Iowa Code (2007) governs no-contact orders and their enforcement. The Court finds this chapter instructive in determining whether there is a clearly defined public policy in Iowa which favors reporting a violation of a no-contact order. Pursuant to Iowa Code § 664A.3, when a person arrested for domestic abuse assault is brought before a state magistrate for his or her initial appearance, the magistrate is required to enter a no-contact order if the magistrate determines that there is probable cause to believe that the domestic abuse assault occurred and the presence of or contact with the defendant poses a threat to the safety of the victim.[7] A no-contact order is a "court order issued in a criminal proceeding requiring the defendant to have no contact with the alleged victim . . . and to refrain from harassing the alleged victim. . . ." Iowa Code § 664A.1. The purpose of a no-contact order "is to protect the victim from harm or harassment." *State v. Lipcamon*, 483 N.W.2d 605, 607 (Iowa 1992). A violation of a no-contact order is punishable as a simple misdemeanor. Iowa Code § 664A.7(5). A court may also hold a person in contempt of court for violating a no-contact order. *Id.*

The provisions of Chapter 664A set forth a clearly defined public policy for the issuance of no-contact orders to protect victims of domestic abuse. The protections provided by a no-contact order are meaningless, however, if they cannot be enforced; a

---

[7] Iowa Code § 664A.3 provides in pertinent part:

> 1. When a person is . . . arrested for any public offense referred to in section 664A.2, subsection 1, and the person is brought before a magistrate for initial appearance, the magistrate shall enter a no-contact order if the magistrate finds both of the following:
>
> a. Probable cause exists to believe that any public offense referred to in section 664A.2, subsection 1, . . . has occurred.
>
> b. The presence of or contact with the defendant poses a threat to the safety of the alleged victim[.] . . .

In this case, the magistrate entered a no-contact order against Miller because he was arrested for domestic abuse assault. *See* Iowa Code § 708.2A.

victim must be allowed to inform law enforcement that the order has been violated. Therefore, the Court concludes that public policy not only favors the issuance of no-contact orders to protect victims of domestic violence, it favors reporting the violation of a no-contact order.

In reaching this conclusion, the Court considers the Iowa Supreme Court's opinion in *Teachout v. Forest City Community School District*, 584 N.W.2d 296 (Iowa 1998). In *Teachout*, the Iowa Supreme Court, relying on Iowa's child abuse laws, determined that "[a]lthough chapter 232 does not specifically mandate protection for an employee who in good faith makes a report of suspected child abuse, we think the forceful language of the statute articulates a well-recognized and defined public policy of Iowa from which such protection can be implied." *Id.* at 300-01. Similarly, the Court finds that although Chapter 664A does not specifically mandate protection for an employee who reports a violation of a no-contact order, the forceful language of the statute articulates a clearly defined public policy of Iowa from which such protection can be implied. Just as Chapter 232 is designed to protect children, Chapter 664A is designed to protect victims of domestic abuse.

### *B. Would Discharge of Employment Undermine Public Policy?*

Having determined that a clearly defined public policy exists, the Court considers whether that public policy would be undermined by a discharge of employment. In this case, Miller was ordered to have no contact with Rayburn, except as necessitated by work since they were both employed by Wady. In May and June 2006, Rayburn reported to police violations of the no-contact order, both at work and outside of work. Defendants warned Rayburn against reporting violations of her no-contact order while at work because it was disruptive to the working environment. Specifically, Defendants informed Rayburn that they did not want the police coming to Wady in response to her reporting Miller for violations of the no-contact order. Significantly, on June 26, 2006, Rayburn reported a violation of the no-contact order which occurred while she working. Based on these facts, the Court finds that it would be contrary to the public policy articulated in Chapter 664A

to allow an employer to take adverse employment action against an employee for reporting the violation of a no-contact order, especially when the violation occurred at the workplace. *See Teachout*, 584 N.W.2d at 301 (indicating that taking adverse employment action against an employee intending to report child abuse would "have the effect of discouraging the reporting of suspected abuse in direct opposition to the public policy of encouraging the reporting of child abuse.").

***C. Did Rayburn's Discharge Result from Her Protected Activity?***

Next, the Court must consider whether Rayburn's discharge was the result of her participation in the protected activity, i.e., reporting violations of the no-contact order. In making such a determination, the Court is guided by the holding in *Teachout*:

> The employee's engagement in protected conduct must be the determinative factor in the employer's decision to take adverse action against the employee. *See Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990); *Graves v. O'Hara*, 576 N.W.2d 625, 628 (Iowa App. 1998). A factor is determinative if it is the reason that 'tips the scales decisively one way or the other,' even if it is not the predominant reason behind the employer's decision. *See Smith*, 464 N.W.2d at 686.

*Teachout*, 584 N.W.2d at 301-02. The Court must examine the evidence to determine whether a reasonable factfinder could conclude that Rayburn's reporting of violations of the no-contact order was the determinative factor in Defendants' decision to terminate her. *See id.* In making that determination, the Court views the record in the light most favorable to Rayburn--the party opposing the Motion for Summary Judgment. *Baer Gallery, Inc.*, 450 F.3d at 820.

Defendants claim that Rayburn was discharged for being disruptive in the workplace. Plaintiff's Interrogatory No. 9 asked Defendants to describe in detail Rayburn's incidents of "disruptive behavior" at the workplace. Defendants' answer to Interrogatory No. 9 states:

> From May, 2006 through June 27, 2006, [Rayburn] repeatedly disrupted the workplace by leaving her work area to talk to

> fellow employees about her case, attempting to have them join her side. [Rayburn] disrupted the workplace by trying to put herself in a position to be near . . . Miller after being ordered not to do so. [Rayburn] disrupted the workplace by having the police come to WADY for things that occurred away from the workplace on June 26, 2006.

(Plaintiff's Appendix at 4) Defendants also claim that they warned Rayburn that they did not want the police to come to Wady in response to her reporting Miller for a violation of the no-contact. Defendants also asserted that the three police visits to Wady in response to Rayburn reporting no-contact violations was a reason for her termination. Significantly, Daurelle testified in his deposition that the primary reason for Rayburn's termination was the police presence at Wady.

Furthermore, Rayburn's work record demonstrates that she earned a raise in September 2005, and April 2006, and was supposed to receive a raise in July 2006, because her attendance was within the established limit, production met the applicable standards, and her general attitude and work habits were acceptable.[8] Significantly, the evaluation for the pay raise which was supposed to take effect in July 2006, was performed on June 26, 2006. The date the evaluation was performed is significant because on June 26, 2006, Rayburn made her final report to police that Miller had violated the no-contact order by tearing down the tarp separating their work areas and grunting at her. According to the performance evaluation, Rayburn's attendance, production, attitude and work habits were all acceptable.[9]

Additionally, in her deposition, Fey indicated that Rayburn was a good employee. Fey stated:

> Q: . . . are you aware of any problems with . . . Rayburn's performance as an employee at WADY's from the time that she first started there in February 2005 up until the

---

[8] *See* Plaintiff's Appendix at 16-18.

[9] *Id*. at 18.

date that a no-contact order issued against . . . Miller at approximately the end of April 2006?
A: No.
Q: Was [Rayburn] a good employee?
A: Yes, she was.
Q: Was she reliable?
A: Yes.
Q: Was she productive?
A: Yes.
Q: Was she cooperative?
A: Yes.

(Plaintiff's Appendix at 22; Lori Fey's Deposition, p. 15, l. 23 - p. 16, l. 12)

Rayburn's supervisor, Raymond Thurston ("Thurston"), also considered Rayburn to be a good employee. In his deposition, Thurston stated:

Q: You have already told me that there were no instances where you disciplined [Rayburn] or gave her any warnings; right?
A: Right.
Q: Was she a good employee during that period?
A: Yes, she was.
Q: Was she reliable?
A: Yes, she was.
Q: Was she productive?
A: Yes, she was.
Q: Did she get along with other co-workers okay?
A: Yes, she seemed to, yes.
Q: Did things change after the no-contact order was issued in April of 2006?
A: She seemed to get along with the other employees fine, yes.
Q: Maybe my question wasn't clear. You are saying after the no-contact order she still got along with the other employees?
A: She got along with the other employees fine that I seen.

(Plaintiff's Appendix at 20; Raymond Thurston's Deposition, p. 17, l. 20 - p. 18, 17)

Lastly, Defendants provide affidavits from several employees who claim that Rayburn told them she wanted to get Miller fired and wanted to sue Wady.[10] Other employees provided affidavits which stated Rayburn talked to her about the situation with Miller.[11] In her own affidavit, Rayburn asserts that Defendants mischaracterized her conversations with other employees. Specifically, Rayburn states:

> 4. Prior to Miller being arrested at Wady's on June 26, 2006 I had never received any disciplinary action or warnings. At no time prior to that had I been warned about talking with other employees.
>
> . . .
>
> 7. In the Affidavit of Terry Anderson submitted by Defendants, it is made to sound as though I was pestering or bothering Terry Anderson. In fact, there was an instance where Anderson came up to me and let me know that Miller was out on the loading dock staring at me. He also came over to my station to tell me he thought . . . Miller was drinking.
>
> 8. In the Affidavits of Sue Kirk and Lila Cook submitted by the defense, I believe my comments to them have been mis-characterized. I do recall talking to each of them on or about June 28, 2006. I remember telling them that the Court Advocate had told me that I should be able to recoup my medical bills from . . . Miller as a victim recovery in the criminal case. I also told them that the Legal Aid attorney in Des Moines had explained that Wadys owed me a safe working environment and that I intended to hold them to that.

(Plaintiff's Appendix at 26-27)

When viewing the evidence in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Rayburn's act of reporting violations of the no-

---

[10] *See* Defendants' Appendix at 8-9.

[11] *Id.* at 10 and 13.

contact order was the determinative factor in Defendants' decision to terminate her. A reasonable jury could base its conclusion on Defendants' concern of police coming to Wady in response to Rayburn reporting Miller for violating the no-contact order at work, warning Rayburn not to do anything which would lead the police to come to Wady, Daurelle's deposition testimony that the police coming to Wady was the "first and foremost" reason for Rayburn's termination, Rayburn's supervisors providing deposition testimony that she was a good worker, and her good work evaluations supporting pay raises.

***D. Is Other Justification for Rayburn's Termination Lacking?***

By finding that a reasonable jury could conclude that Rayburn's act of reporting violations of the no-contact order was the determinative factor in Defendants' decision to terminate her, it follows logically that a jury could conclude that other justifications for her termination were lacking. Nonetheless, the Court will address the fourth factor articulated in *Lloyd*. *See Lloyd*, 686 N.W.2d at 228 (the fourth factor which a plaintiff must prove to succeed on a claim of wrongful discharge in violation of public policy is whether other justification for the discharge was lacking). The Court finds that there are disputed issues of material fact as to whether Defendants provided other justifications for discharging Rayburn. Viewing the evidence in the light most favorable to Rayburn, the Court finds that a reasonable jury could conclude that Rayburn's discussions regarding Miller and the no-contact order with other employees was not disruptive. Specifically, there are disputed issues of material fact as to whether Defendants warned Rayburn about talking with other employees about Miller and the no-contact order, the frequency with which she spoke to other employees, and the nature of her comments to other employees.[12] In light of the foregoing, the Court finds that summary judgment is inappropriate and Defendants' motion should be denied.

---

[12] *Compare* Rayburn's Affidavit (Plaintiff's Appendix at 26-27) with the affidavits of her co-workers (Defendants' Appendix at 8-13).

## *VI. CONCLUSION*

The Court finds that there is a public policy in Iowa which favors reporting violations of a no-contact order. The Court further finds that the public policy would be undermined by the discharge of an employee for reporting the violation of a no-contact order in the workplace. The Court also determines that a reasonable jury could conclude that Rayburn's reports of Miller violating the no-contact order was the determinative factor in Defendants' decision to terminate her, and that other justification for her termination was lacking. Therefore, the Court finds that Defendants' summary judgment motion should be denied.

## *ORDER*

The Motion for Partial Summary Judgment (docket number 16) filed by Defendants is **DENIED**.

DATED this 10th day of April, 2008.

JON STUART SCOLES
United States Magistrate Judge
NORTHERN DISTRICT OF IOWA